IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:06-cr-00203-1 |
| v. | ) |
| | ) |
| MARK BRADFORD YARBROUGH, SR., | ) |
| | ) |
| Defendant. | ) |

**OPINION**

**Mark R. Hornak, Chief United States District Judge**

On June 10, 2022, Mark Bradford Yarbrough, Sr. ("Yarbrough") was sentenced to a 24-month term of imprisonment for a violation of his conditions of supervised release. (ECF No. 251). Yarbrough now seeks compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), from this term of imprisonment. (ECF Nos. 257, 259). Yarbrough argues that compassionate release is justified because (1) he seeks to be a caregiver for his elderly mother; (2) he is concerned with his susceptibility to the COVID-19 virus; and (3) of his debilitating heart conditions and a claimed lack of proper Bureau of Prisons medical care for them (ECF No. 257 at 3). On November 30, 2023, the Court held a Hearing on Yarbrough's Motion. That Motion is now fully briefed and ripe for disposition. For the reasons that follow, Yarbrough's Motion for Compassionate Release is DENIED.

    I.    **Background**

        a.  **Criminal and Procedural History**

Yarbrough has a lengthy history of criminal convictions that extends back decades. (ECF No. 279 at 1). But the conviction from which the current action indirectly flows stems from a 2010

1

federal conviction in this Court. On March 15, 2010, Yarbrough was sentenced to a term of 180 months in federal prison, followed by a 5-year term of supervised release. (ECF No. 195). Yarbrough, at that time, also received credit for time he had already spent incarcerated related to the charge for which he was ultimately imprisoned. (*Id.* at 2).

Yarbrough was released from prison on June 24, 2019. (ECF No. 257 at 4). On April 27, 2022, an arrest warrant was issued pursuant to a search conducted at his residence that revealed crack cocaine, marijuana, over $1,100 in cash, and drug trafficking paraphernalia. Yarbrough's supervised release was revoked on June 10, 2022, and he was sentenced to a 24-month term of imprisonment. (ECF No. 251).

Yarbrough quickly filed a Motion for Compassionate Release (ECF No. 252) based on his medical conditions and a desire to care for his elderly mother, but on September 26, 2022, that Motion was denied due to Yarbrough's failure to exhaust his administrative remedies. (ECF No. 254). On April 6, 2023, Yarbrough filed a new Motion for Compassionate Release. (ECF No. 257). Yarbrough also filed a Motion to Vacate his conviction, but he subsequently withdrew that Motion in the second counseled supplement to his Motion for Compassionate Release (ECF Nos. 262, 267 ¶ 2), and neither Yarbrough nor his appointed counsel have submitted a further amended filing per the Court's Order at ECF No. 299.

Yarbrough is set to be released from federal prison on January 8, 2024, but he is subject to a Pennsylvania state detainer and will be placed in state custody in the Washington County (PA) Jail after his release from federal custody. (ECF No. 280 at 1–7).

### b. Medical Conditions and Other Bases for Compassionate Release

In his Motion for Compassionate Release, Yarbrough alleges that he has (a) congestive heart failure; (b) enlarged heart; (c) orthopnea (shortness of breath while lying flat); (d) osteo arthritis; (e) external dyspnea (labored breathing); and (f) tachypnea (abnormally rapid breathing). (ECF No. 257 at 4). The congestive heart failure is the crux of his medical-related reasons advanced for compassionate release, and he allegedly had to wear a "defibrillator life vest" from July–October 2021. (*Id.* at 5). In December 2022, a test revealed a blockage in Yarbrough's heart, and this finding prompted a Certified Physician's Assistant at the Bureau of Prisons ("BOP") to make a request for Yarbrough to be evaluated by a cardiologist, but as of the April 2023 filing of the Motion for Compassionate Release, Yarbrough had yet to be seen by such specialist. (*Id.*).

Upon receipt of the original submissions from the parties, the Court ordered that the Government submit periodic updates as to Yarbrough's health. (ECF Nos. 286, 291). In response, the Government submitted detailed filings that provided updates as to Yarbrough's health based on BOP medical records, and those filings also included those BOP medical records. (ECF Nos. 287, 288, 289, 290, 292, 293, 295, 296, 300, 301). Those reports and records reveal that Yarbrough has regularly been seen by the BOP medical staff. (ECF No. 293 ¶ 3). In addition, since the submission of his April 2023 Motion, Yarbrough has been seen twice by outside cardiologists at the BOP's behest.

At his first outside consultation, which took place in August 2023, the cardiologists recommended additional testing and follow-up care. (ECF No. 289). Shortly thereafter, following consultation with BOP medical staff, a request for a heart catheterization was placed. (ECF No. 292 at 2). That procedure was performed in early November 2023, and it revealed that Yarbrough suffers from unstable angina and heart failure with reduced ejection fraction. (ECF No. 301 at 22).

Yarbrough was told by the outside cardiologists to call back in one month's time to schedule a follow-up appointment and provided him with adjusted cardiac and other medication. (*Id.* at 23, 24).

Yarbrough also notes, as separate and distinct bases warranting compassionate release, that his underlying medical conditions make being infected by the COVID-19 virus more dangerous than in the ordinary case and that he desires to be a caretaker for his elderly mother.

## II.     Legal Standard

Generally, a federal court may not modify a term of imprisonment after it has been imposed. *Dillon v. United States*, 560 U.S. 817, 819 (2010). The First Step Act's amendment to 18 U.S.C. § 3582, however, permits federal courts to modify a defendant's term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A). The statute provides, in relevant part, that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction[;] and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

*Id.*

Motions for Compassionate Release thus generate four separate inquiries: (1) whether the defendant fully exhausted his administrative remedies with the BOP; (2) whether the defendant has presented "extraordinary and compelling reasons" to warrant a reduction of or release from

the term of imprisonment; (3) whether the factors set forth in 18 U.S.C. § 3553(a) support the modification of the term of imprisonment; and (4) whether policy statements issued by the United States Sentencing Commission are consistent with the reduction of sentence sought. Yarbrough must demonstrate, at each analytical stage, that he is entitled to compassionate release by a preponderance of the evidence. *United States v. Bednarski*, No. 1:19-cr-20-2, 2022 WL 80080, at *4 (W.D. Pa. Jan. 7, 2022) (citations omitted). The Court will consider whether each of Yarbrough's arguments has made a showing that clears all of § 3582's hurdles.

### III. Discussion

#### a. Caretaker for Mother

Though Yarbrough raised his desire to be his mother's caretaker in his administrative petitions with the BOP (ECF No. 259-1 at 7), this basis for compassionate release does not rise to an extraordinary and compelling level.

Though the Sentencing Commission's Guidelines and Policy Statements are not binding; the Policy Statements are best viewed as providing courts with goalposts. *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1045 (10th Cir. 2021). § 1B1.13 of the U.S. Sentencing Guidelines (which was revised by the Sentencing Commission effective November 1, 2023) provides that family circumstances, such as the incapacitation of one's parent, can constitute an extraordinary and compelling reason for release. U.S.S.G. § 1B1.13(b)(3)(C). But the defendant must be "the only" available caregiver for the incapacitated parent. *Id.* Here, both the record from the November 30, 2023 Hearing and Yarbrough's Pre-Sentence Report ("PSR") reveal that other family members exist who can potentially serve as a caretaker for Yarbrough's mother, including one of three other children and one of at least seven grandchildren. (ECF No. 279 at 12 (citing to PSR)). At the hearing on this

Motion, at which Yarbrough testified, there was no testimony that obviated the facial availability of other family members as potential viable caregivers. Given this close family group, Yarbrough cannot be said to be the "only" person who can serve as his mother's caregiver.

In addition, even absent other caretakers, if Yarbrough were to be released, practical matters complicate his ability to be a caretaker for his mother. The trip between his mother's home and her doctor's address is thirty-eight miles each way, and Yarbrough's driver's license is currently expired and will be suspended for a year once it is renewed due to his conviction for fleeing from law enforcement. 75 Pa. Cons. Stat. § 1532(b)(3). Further, Yarbrough does not provide his mother's medical records, or records of any sort, so as to demonstrate her incapacitation. And beyond that, there is nothing in the record that rebuts what appears to be knowledge common between the parties—whenever and however Yarbrough is released from federal prison custody, he is going straight into the Washington County Jail, obviating his availability to reside with and care for his mother.

Given the absence of proof as to his mother's medical conditions, and the reality that the burden to otherwise prove that one's family (particularly family care) circumstances are extraordinary and compelling lies with the defendant, *Bednarski*, 2022 WL 80080, at *4, and that Yarbrough is not the only family member, let alone other individual, who could potentially serve as his mother's caretaker, Yarbrough has not shown that this basis for release rises to an extraordinary and compelling level.

b. **COVID-19 Susceptibility**

To exhaust one's administrative remedies as required by 18 U.S.C. § 3582, a defendant must file a request for compassionate release with the Warden of their BOP facility and then either

(1) fully exhaust the BOP's administrative remedies or (2) wait thirty days from the receipt of the request by the Warden of the defendant's BOP facility. The Third Circuit's holding in *Raia* mandates strict compliance with this requirement. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (concluding that the failure to demonstrate administrative exhaustion presents "a glaring roadblock foreclosing compassionate release").

However, "[t]he few district courts that have addressed [the question of whether a defendant must exhaust each "issue" that they intend to bring before a district court] disagree on whether a defendant must specifically mention the COVID-19 pandemic in a BOP administrative request for compassionate release." *United States v. Davidson*, No. 2:16-cr-00139-2, 2020 WL 4877255, at *8 (W.D. Pa. Aug. 20, 2020) (internal marks and citations omitted).

In *Davidson*, this Court concluded that the text of the First Step Act did not address whether each individual health issue must be distinctly exhausted, particularly as to COVID-19 susceptibility given the BOP's publicly-stated commitments to assess and mitigate COVID-19 health impacts. *Id.* at *7. This Court then examined four cases, and in each one, the reviewing court held that it would not consider conditions for release that were not specifically stated in the administrative request directed at the warden. *United States v. Wilson*, No. 14-cr-209, 2020 WL 1975082, at *4 (E.D. Pa. Apr. 24, 2020); *United States v. Walls*, 455 F. Supp. 3d 461, 465 (E.D. Mich. 2020); *United States v. Mogavero*, No. 15-cr-74, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020); *United States v. Valenta*, No. 15-cr-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).

The *Davidson* Court concluded that the matter then before it was distinguishable from those four cases because the BOP had concluded its administrative review prior to the onset of the COVID-19 virus. *Davidson*, 2020 WL 4877255, at *11–*12. The Court concluded that another

7

line of cases based on changing health conditions was more applicable. *United States v. Smith*, 464 F. Supp. 3d 1009, 1018 (N.D. Iowa 2020); *United States v. Coker*, No. 14-cr-085, 2020 WL 1877800, at *3 (E.D. Tenn. Apr. 15, 2020); *Miller v. United States*, 453 F. Supp. 3d 1062, 1065 (E.D. Mich. 2020). To put it succinctly, those courts generally viewed COVID-19, when not referenced in an administrative complaint but later cited in a motion for compassionate release, as something that exacerbated the main health condition at issue, not as an independent, unpled basis for release.

However, unlike in that second line of cases, COVID-19 has been around for several years now—it is not something that snuck up on Yarbrough or the BOP, and Yarbrough made no mention of COVID-19 in his administrative complaints to the BOP. Additionally, Yarbrough lists his COVID-19 concerns under a separate heading in his current Motion, and his arguments regarding COVID-19 are isolated from his arguments regarding his main health issues. The degree to which Yarbrough focused on COVID-19, in isolation, in his Motion for Compassionate Release makes plain this is a distinct basis for release, and as such, his arguments on this point should have been administratively exhausted prior to being considered by this Court. Because he did not seek to at all address these concerns with the BOP, Yarbrough's COVID-19 susceptibility argument was not properly exhausted and therefore cannot serve as a basis for compassionate release.

Further, the Court would note that the medical records revealed that Yarbrough has affirmatively declined receiving the COVID-19 vaccine and the seasonal flu vaccine, medical mitigation activity that one would easily conclude to be most advantageous to someone with the cardiac and respiratory limitations Yarbrough contends that he has. At the Motion Hearing, he explained this as being the result of his cautious uncertainty, given his recent cardiac tests, and the

inability of the medical technician that was to administer the vaccines at the BOP to fully brief Yarbrough on the indications/contraindications of such vaccines in his case.

While the Court does not view Yarbrough's declination of such vaccines to be relief barring as a definitional matter, it does find his explanations unpersuasive. First, the records reflect that he has continually refused such such vaccines for more than a year now, well before concerns over his most recent testing and medications could have arisen. (ECF No. 280-2 at 1). Second, Yarbrough's own descriptions of his efforts to learn about the advisability of such vaccines from the physicians treating him struck the Court as tepid at best. Consequently, the Court is not convinced that Yarbrough's reference to COVID-19 vulnerability is much more than a makeweight argument, and it has not, for these purposes, been exhausted.

c. **Heart Conditions and Lack of Punctual Medical Care**

Yarbrough's final argument is that his heart conditions and the alleged lack of proper BOP medical care associated with those conditions constitute extraordinary and compelling reasons for release.[1] As set forth above, "§ 3582 does not define what constitutes 'extraordinary and compelling reasons,' but delegates that task to the U.S. Sentencing Commission." *Bednarski*, 2022 WL 80080, at *3. And although the Sentencing Commission's Guidelines and Policy Statements are not binding, the Court can consider such sources as guides per the plain text of 18 U.S.C. § 3582(c). *See Andrews*, 12 F.4th at 260 ("Moreover, the District Court looked to the policy statement's descriptions of extraordinary and compelling circumstances as a guide, not as an ultimate binding authority. . . . That is not error.").

---

[1] Yarbrough administratively exhausted these reasons for release. (ECF No. 259-1 at 1).

The Sentencing Guidelines provide that the medical circumstances of a defendant can constitute an extraordinary and compelling reason for release. U.S.S.G. § 1B1.13(b)(1). For these purposes, medical circumstances are "extraordinary and compelling" where (1) the defendant is suffering from a terminal illness, that is, a "serious and advanced illness with an end-of-life trajectory"; (2) the defendant is suffering from a serious physical or medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id.*

Yarbrough's arguments on this point are best construed as implicating the latter two options, as his heart conditions, based on the record before the Court, do not place him on an "end-of-life" trajectory. As to the first of the latter two options, that Yarbrough is suffering from a serious medical condition that substantially diminishes his ability for self-care, Yarbrough relies on *United States v. Hatmaker*, No. 06-20465, 2021 WL 2042314 (E.D. Mich. May 21, 2021). In *Hatmaker*, the court considered the compassionate release motion of an FCI Hazelton prisoner with similar health issues—Hatmaker had significant cardiovascular problems, was awaiting an outside evaluation due to a medical backlog in the BOP, and was originally sentenced for racketeering, a relatively serious offense. *Id.* at *1. The court ultimately granted Hatmaker's motion for compassionate release, concluding that although Hatmaker's underlying crime was serious, the health risks and custodial time already served for his offense constituted sufficient reason to grant the motion for compassionate release. *Id.* at *2–*3.

*Hatmaker* is inapposite here. Unlike in the case now before the Court, Hatmaker was waiting on outside evaluations that had not occurred as of the date of the court's decision, and shutdowns due to the COVID-19 pandemic made it unclear whether Hatmaker would be evaluated by an outside specialist. *Id.* at *2. Here, Yarbrough *has* been seen by outside medical specialists multiple times. Further, due to the state of the COVID-19 pandemic at the time its opinion was issued, the *Hatmaker* court was concerned with the defendant's increased risk of negative consequences from being infected with the coronavirus given his underlying risk factors. *See also United States v. Yepremian*, No. CR H-15-0346-1, 2021 WL 612400, at *2 (S.D. Tex. Feb. 9, 2021) (granting motion for compassionate release where defendant had cardiovascular and respiratory illnesses due to the increased risk such individuals faced from COVID-19). Here, the current Administration has announced that the pandemic was over. Ayana Archie, *Joe Biden Says the COVID-19 Pandemic Is Over. This Is What the Data Tells Us*, NPR (Sept. 19, 2022), https://www.npr.org/2022/09/19/1123767437/joe-biden-covid-19-pandemic-over.  And though Yarbrough points to the criticism that such announcement drew, the actual facts appear to support the reality that the pandemic is no longer a material factor as to the BOP facility in which he is located. There, the facility is at COVID-19 operational level 1, which means that the new community positive rate is less than 0.1% (100 per 100,000) over the last seven days. *BOP COVID-19 Statistics*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_statistics.html (last visited Dec. 7, 2023). Thus, the relevant data appear to show that Yarbrough's risk of being infected with COVID-19 is, at this juncture, not elevated in a way that is beyond what exists outside prison, and Yarbrough has not advanced evidence to the contrary.

In addition, Yarbrough's repetitive refusal to receive the COVID-19 vaccine undercuts the legitimacy of his concern for catching the virus given his underlying heart conditions. *United*

*States v. Ortiz*, No. 5:18-cr-00264, 2021 WL 1422816, at *3–*4 (E.D. Pa. Apr. 15, 2021); *United States v. Jackson*, No. 07-cr-40-2, 2021 WL 1145903, at *2 (E.D. Pa. Mar. 25, 2021) ("Where Jackson bears the burden of demonstrating her entitlement to relief, the Court finds that her unexplained refusal to accept a COVID-19 vaccination when offered negates her otherwise compelling medical reasons for release."). Similarly, here, Yarbrough's refusal to receive the COVID-19 vaccine went unexplained until the Motion Hearing, in which he cited a general distrust of BOP medical staff and, according to Yarbrough, a lack of explanation as to the operational mechanisms of the vaccine and the effects it (the vaccine) could have on his heart health. But in the past, when prompted to take medication related to his heart health, Yarbrough stopped taking such medication because of his self-stated "laziness." (ECF No. 293-1 at 1). Particularly given his habit of failing to take prescribed medication, Yarbrough's allegations regarding the quality of the BOP's medical care generally and his allegations that the medical staff failed to explain the vaccine's mechanisms and consequences are not credible. Thus, the *Hatmaker* court's two main considerations are inapplicable here.

Also, Yarbrough's conditions, as serious as they are, do not appear to substantially impact his ability for self-care. Per his statements at the Motion Hearing, he is still able to move around the prison facility and does not require help performing everyday tasks such as getting dressed and making his bed. In addition, though Yarbrough argues that his conditions are so debilitating that he is only able to get food to eat in his cell/pod area by personal purchase from the prison commissary and not via mealtime in the dining hall, his commissary invoices reflect purchase levels that do not demonstrate that Yarbrough only gets food from there. (ECF No. 301-1 at 1–5). Despite his conditions, then, it appears that Yarbrough, on the record before the Court, has not

demonstrated that those conditions substantially impact his ability for self-care. Therefore, his conditions do not constitute an extraordinary and compelling reason for release.

As for his arguments regarding lack of proper medical care, courts have been willing to grant a motion for compassionate release in instances in which the BOP's medical care falls so woefully short as to support the existence of extraordinary and compelling medical needs. *See United States v. Acosta*, No. 19-CR-389, 2022 WL 2133866, at *1 (E.D. Pa. June 14, 2022). Acosta had several medical conditions, including

> insulin-dependent diabetes mellitus, hyperlipidemia, diabetic retinopathy, hypertension, gastro-esophageal reflux and adjustment disorder with anxiety. For these conditions, Acosta must sleep in a bottom-bunk, wear medical braces for his back and elbow, an eye-patch and shield, medical shoes and cannot lift objects heavier than 15 pounds. Acosta's diabetes has worsened to the point of blindness while he was incarcerated at the FDC because he was fed a daily diet of peanut-butter and jelly sandwiches. Notably, the Government does not deny this allegation.

*Id.* at *3. The condition most at issue was Acosta's blindness, as physicians stated that Acosta was at risk of "'permanent vision loss without follow-ups' as instructed." *Id.* The court noted that "the fact that the BOP has been less than punctual in providing Acosta the medical care, despite his physician's repeated demands about the importance of timely care, also weighs in favor of a finding of extraordinary and compelling circumstances." *Id.* (citing *United States v. Beck*, 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019)). The court concluded that Acosta's medical conditions and the lack of punctual medical care from the BOP constituted extraordinary and compelling reasons for release.[2] *Id.* at *3–*4.

The more extreme circumstances at issue in *Acosta* are not at issue here. Defendant has been seen by the BOP medical staff dozens of times throughout his stay at FCI Hazelton, has had

---

[2] The *Acosta* court ultimately denied the motion for compassionate release due to the 18 U.S.C. § 3553 factors. *Acosta*, 2022 WL 2133866, at *1.

13

two outside cardiac consultations, and has even had a complex procedure done to uncover the root of his symptoms, which has already led to follow-up care. Yarbrough also has not shown that his conditions have deteriorated in a manner akin to Acosta's worsening vision problems.

To the extent that Yarbrough argues that he would receive better treatment outside the BOP, his state detainer undercuts that argument. Yarbrough will not necessarily be able to immediately visit his primary care physician even if he were granted compassionate release. Instead, Yarbrough will be obligated to visit the Washington County corrections' medical staff to address his conditions for the foreseeable future, and he has not demonstrated otherwise. Yarbrough has not demonstrated a lack of proper BOP medical care, and even if he had, his inability to see his stated physicians of choice due to his impending period in state custody hampers the efficacy of any such argument on this topic.

Accordingly, neither Yarbrough's cardiac condition, nor his claimed lack of proper medical care, constitute an extraordinary and compelling reason for early release. Because the Court has concluded that none of Yarbrough's independent bases for compassionate release rise to the level of extraordinary and compelling (considered together or separately), the Court need not, and does not, reach the 18 U.S.C. § 3553 factors.

### IV.  Conclusion

Based on the foregoing reasons, Yarbrough's Motions for Compassionate Release (ECF Nos. 257, 259) are DENIED.

s/ Mark R. Hornak  
Mark R. Hornak  
Chief United States District Judge

Dated: December 13, 2023